FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR -2  PM 4: 34

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WANITA BARRETT   o/b/o D.A.B., JR.          CIVIL ACTION

VERSUS                                       NO. 04-2385

JO ANNE B. BARNHART,                         SECTION: "A"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying the application for Supplemental Security Income ("SSI") benefits of plaintiff-in-interest herein, D.A.B., Jr. (Rec. Docs. 8, 9).

Wanita Barrett, mother of D.A.B., Jr., filed an application for SSI benefits on behalf of her son on March 21, 2001, with a protective filing date of March 6, 2001, alleging disability as of September 20, 1995.  (Tr. pp. 44-44A, 43).  In a Disability Report completed by Ms. Barrett on March 21, 2001, she identified ADHD, depression, nerves, a sleep disorder, and social phobia as her son's disabling conditions.  (Tr. pp. 49-59).  *Plaintiff's*



application for SSI benefits was denied at the initial step of the
defendant's administrative review process on October 8, 2001,
following which he requested a hearing de novo before an
Administrative Law Judge ("ALJ"). (Tr. pp. 34- 37, 38). That
hearing subsequently went forward on July 30, 2003 at which
plaintiff, his mother, their attorney, and a Medical Expert ("ME")
appeared and testified. (Tr. 387-414). On August 26, 2003, the
ALJ issued a written decision in which he concluded that plaintiff
was not disabled within the meaning of the Social Security Act.
(Tr. pp. 14-25). The Appeals Council ("AC") ultimately denied
plaintiff's request for review of the ALJ's decision, thus making
the ALJ's decision the final decision of the Commissioner. (Tr.
pp. 4-10). It is from that unfavorable decision that the plaintiff
seeks judicial review pursuant to 42 U.S.C. §1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the
issue for judicial review as follows:

> [t]he ALJ failed to find that the plaintiff's impairments
> are functionally equivalent to Listing 112.11.

(Rec. doc. 8, p. 8).

Relevant to the issue to be decided by the Court are the
following findings made by the ALJ:

1.  [t]here is no evidence that claimant has engaged in
    substantial gainful activity since the alleged onset
    date.

2.   [t]he medical evidence establishes that claimant has a "medically determinable impairment(s) that is severe" within the meaning of <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985), SSR 96-3p and 20 CFR 416.924(c).

3.   [c]laimant's condition does not meet or medically equal the criteria for any impairment listed in Appendix 1, Subpart P, Part 404.

4.   [c]laimant's assertions relative to symptomatology, pain, functional limitations and restrictions of activities of daily living have been considered in light of the factors set forth in 20 CFR 416.929 and SSR 96-7p, are found to be exaggerated, lack corroboration or substantiation in the medical evidence, and are not credible as to a disabling impairment.

5.   [t]here is no evidence of limitation relative to the domains of acquiring and using information, moving about and manipulating objects, and health and physical well being.

6.   [t]here is less than a marked limitation relative to the domains of attending and completing tasks, interacting and relating with others, and caring for oneself.

7.   [t]here is no evidence that any impairment or combination of impairments presented the requisite functional limitations in the pertinent domains such that the impairment or combination of impairments were functionally equivalent to the listings in Appendix 1 of Subpart P, Part 404.

8.   [c]laimant was not disabled at any time through the date of this decision.

                                        (Tr. pp. 24-25).

Judicial review of the Commissioner's decision to deny SSI benefits is limited under 42 U.S.C. §1383(c)(3) to two inquiries: (1) whether substantial evidence of the record supports the

Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant, whether a child or an adult, bears the burden of proving that he is disabled within the meaning of the Social Security Act.  In making a disability determination on a child, the Commissioner utilizes the three-step sequential evaluation set

4

forth in 20 C.F.R. §416.924, as follows:

1.    determine whether the child engaged in substantial
      gainful activity during the relevant time frame, and, if
      not;

2.    determine whether the child has a medically determinably
      severe impairment and, if so;

3.    determine whether the impairment meets, medically equals,
      or functionally equals an impairment set forth in the
      Listing of Impairments, Appendix 1, Subpart P, Part 404.

> See <u>Verrett  v. Commissioner of Social
> Security</u>, 2001 WL 179922 at *1 n. 7
> (E.D.La. Feb. 20, 2001).

     In determining whether a child's impairment is functionally
equivalent to one set forth in the Listing of Impairments, the
Commissioner considers the child's limitations in the following six
domains: acquiring and using information; attending and completing
tasks; interacting and relating with others; moving about and
manipulating objects; caring for oneself; and, health and physical
well-being.  20 C.F.R. §416.926a(g)-(1).  To be functionally equal
to a listing and thus of listing-level severity, the child must
have "marked" limitations in two of the six domains or an "extreme"
limitation in one domain.  20 C.F.R. §416.926a(d).

     At the administrative hearing held on July 30, 2003,
plaintiff's attorney opened by arguing that plaintiff suffered from
severe emotional problems manifested by depression, isolation, poor
impulse control, outbursts, auditory hallucinations, and homicidal

5

ideations, especially towards his brother.  Counsel further argued
that plaintiff's major depression satisfied the criteria of Section
112.04 of the Listing of Impairments as he had marked limitations
in social functioning, personal functioning, and in acquiring and
using information.  Plaintiff, who weighed 116 pounds and was in
seventh grade special education classes at the time, then took the
stand. He testified that he sometimes fought with his brother and
other students, that he suffered impetigo, and that he socialized
very little with other classmates.  As it was summer at the time,
plaintiff's daily routine consisted of rising at 7:00 a.m., playing
video games, and visiting with his aunts.  He had been held back in
the second grade and was most recently making C's and D's in
school.  Plaintiff was being treated by Dr. Dean who had prescribed
Ritalin which he took in the morning and which he believed was
helping him behave and reduce the number of altercations he got
involved in.

Upon being questioned by his attorney, plaintiff testified
that he had trouble thinking and concentrating, that he had heard
voices in the past, and that he took medication to help him sleep.
He got along with his teachers but sometimes had thoughts of
wanting to harm his brothers.  (Tr. pp. 387-397).

Plaintiff's mother then took the stand.  Plaintiff had been in
sixth grade regular education classes at the start of the previous

6

school year only to be moved to special education classes because of his behavioral problems.  By way of clarification, Ms. Barrett testified that plaintiff was not on Ritalin but instead took Adderall, Prozac, Trazodone, and a fourth medication and that he saw Dr. Mason once per month.  Under counsel's questioning, Ms. Barrett testified that plaintiff was unsociable, angry, defiant, impulsive, and sometimes violent, particularly with his younger brother.  Plaintiff often destroyed his toys, chewed or tore his clothing, and picked at his skin due to nervousness, leaving blood stains on his shirts and pants.  Prior to their family's recent move, plaintiff did play basketball with some neighborhood boys but tended to prefer smaller social groups.  Ms. Barrett also recalled an incident in October of 2002 in which plaintiff had been arrested and placed in a diversion program after arming himself with a kitchen knife in response to neighborhood boys harassing his brother.  Contrary to Dr. Dean's report of February of 2003 that plaintiff was doing well on his prescribed medication and that only one teacher had complained about his behavior, Ms. Barrett testified that when asked, almost all of his teachers had negative feedback about his at-school demeanor.  Ms. Barrett also testified that plaintiff's disruptive behavior at school was what had prompted his evaluation for and placement in special education classes.  (Tr. pp. 397-404).

Dr. Carlos Kronberger, A ME with a background in clinical psychology, was next to take the stand. After describing his work experiences, Dr. Kronberger questioned Ms. Barrett on the types and dosages of the medications plaintiff was taking. The doctor also questioned whether there was an event that precipitated plaintiff's first diagnosis of depression at the age of six or seven. In answer thereto, Ms. Barrett testified her family had relocated to the New Orleans area when plaintiff was three years old, following which a number of their immediate family members passed away and Ms. Barrett experienced some personal health issues as well. In addition to medication, plaintiff attended psychotherapy sessions to deal with his anger and social phobia. Outside interests included bowling and putting together models. Plaintiff had been treated on an inpatient basis when he was seven years old and he had been suspended three times in the previous school year.

After various information was elicited from Ms. Barrett, the ALJ queried Dr. Kronberger as to whether plaintiff's condition satisfied the criteria of any of those set forth in the Listing of Impairments. In answer to that question, the doctor testified that plaintiff's condition met or was functionally equal to that set forth in Section 112.11 relative to ADHD. When asked to elaborate, Dr. Kronberger testified that although plaintiff's treatment record was less than crystal clear, plaintiff clearly had problems with

marked inattention, impulsivity, and hyperactivity, classic symptoms of combined-type ADHD.  Medication did appear to be helping plaintiff with his problems and there was no evidence of true psychosis.  However, with medication, the ME believed that plaintiff's condition was chronic and may manifest itself from time to time and that he was in need of continued psychiatric treatment. Plaintiff continued to have moderate problems in social functioning, mild to moderate problems in personal functioning, and moderate problems with concentration, persistence, and pace.  Upon being questioned by counsel, Dr. Kronberger testified that in his opinion, plaintiff was not markedly impaired in social functioning or personal functioning.  (Tr. pp. 404-414).

The documentary evidence related to the relevant time period[1]/ begins with an integrated summary from plaintiff's clinical manager at Active Intervention for the quarter ending on March 20, 2000. There, it was reported that plaintiff continued to fight with his brother at home but with much less frequency and severity.  "His

---

[1]/   Plaintiff had filed a previous application for SSI benefits in 1998 alleging disability as of June 30, 1990 due to essentially the same conditions that were identified in his current application.  On January 21, 2000, an ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act, a conclusion that was upheld following judicial review in Barrett v. Soc. Sec. Admin., 02-CV-1731 "B"(4).  Thus, plaintiff's entitlement to SSI benefits through January 21, 2000 has already been adjudicated to his detriment and cannot be revisited here.

9

overall mental health ha[d] greatly improved recently" and plaintiff's teachers described him as more talkative and his mother reported that he was more affectionate. It was noted, however, that Ms. Barrett's depression, anxiety, and lack of self-confidence continued to significantly interfere with her ability to parent plaintiff and his siblings. Plaintiff was found to have achieved various mental health and social goals including properly taking his prescribed medications, completing his homework assignments more regularly, and interacting appropriately with others. (Tr. pp. 190-192).

On March 10, 2000, the Jefferson Parish Public School System issued its Integrated Evaluation Report ("IEP") on plaintiff, finding that he was not an exceptional child at that point in time. (Tr. pp. 288-294). On April 15, 2000, personnel at Active Intervention issued a closing summary, their final report on plaintiff's treatment there. Plaintiff's at-home altercations with his brothers continued to decline in frequency and severity, his mental health had "greatly improved," and his teachers noted him to be more talkative. Previously-established goals were met, plaintiff was spending more time with his parents, and his father was taking on a greater role in the process. In light of the improvement seen, Active Intervention determined that the termination of their services was appropriate. (Tr. pp. 188-189).

Plaintiff's medications at the time included Adderall, Prozac, and Buspar. (Tr. p. 182). Trazodone was added on May 8, 2000. (Id.).

On May 30, 2000, plaintiff was evaluated at the Jefferson Parish Human Services Authority ("JPHSA").  Presenting problems identified by Ms. Barrett included plaintiff worrying, picking sores and skin around his mouth, face, and legs, throwing tantrums and attacking his younger brother, becoming aggravated easily, and being anxious.  Ms. Barrett also reported that from August to December of the previous year, plaintiff had developed an obsession with goats, stating that he wanted to be a goat, chewing on grass, checking out books about goats, asking Santa for a goat, and generally acting like a goat. The screening form indicated that plaintiff routinely stayed up all night before going on medication but that he was now retiring at a more appropriate hour. Plaintiff's energy level was normal since starting on Adderall which was also helping with his performance at school where it was noted that he had received A's in behavior, had not been suspended, and had good peer/teacher relationships.  The reporting social worker also indicated that Buspar was effective in controlling plaintiff's anxiety and his self-destructive, skin-picking behavior. Plaintiff had pet hamsters that he was raising as a hobby but the social worker noted that he was refusing to do his homework because his older brother did not do his.  (Tr. pp. 228-239).

11

On June 9, 2000, plaintiff was treated for insect bites at the Westcare Medical Center ("WMC"). (Tr. p. 257). He was next seen there on July 12, 2000 for a refill on his medications, chills, a cough, and sores on his legs. (Tr. pp. 254-257). Plaintiff returned to JPHSA on August 2, 2000 where he underwent a psychiatric evaluation by Dr. Ellen Gandle. Ms. Barrett reported to the doctor that plaintiff was doing "OK" on his current medications but that he was depressed at the time. On mental status examination, plaintiff had a sad, quiet affect, logical thought processes, was alert but did not know the month, and had fair impulse control. Dr. Gandle noted that plaintiff enjoyed playing outside with his friends and that he liked animals. The diagnosis was depressive disorder and anxiety disorder, not otherwise specified, a history of impulse control disorder, and a history of ADHD with a GAF score of 60. The plan was to continue plaintiff's current medications and for him to return to the clinic in one month. (Tr. pp. 223-227).

Plaintiff was seen again at WMC on August 15, 2000 for sores on both legs and sinus problems. The assessment was impetigo. (Tr. pp. 252-253). Treatment for a sore throat and stomach pain was administered on August 25, 2000. (Tr. pp. 248-251). On September 18, 2000, plaintiff's mother attended a meeting at JPHSA and was advised of the availability of various services for her

12

son.  (Tr. p. 220).  Plaintiff himself attended a social skills group session at JPHSA on that same date at which he spoke about his deceased grandfather. (Tr. p. 221).  Staples were removed from plaintiff's scalp on September 19, 2000. (Tr. p. 246).

On October 11, 2000, plaintiff was seen at the West Jefferson Child and Adolescent Clinic ("WJCAC") which had apparently been treating him for some time.  He was described as  doing "OK" with no side effects from his medication but becoming very defiant when he was not compliant with his treatment.  He was having some trouble with his schoolwork but his mood had been stable and his sleep had been good.  Plaintiff was to continue with his medications and return to the clinic in six weeks.  (Tr. p. 277). Plaintiff was then seen at WMC on October 24, 2000 for a swollen eye and a rash behind his right ear. (Tr. p. 245).  Arm numbness was plaintiff's complaint on November 8, 2000 and he was referred to a neurologist. (Tr. pp. 241-244).  An ankle injury precipitated a visit to the emergency room on December 2, 2000 but x-rays were normal.  (Tr. p. 240).  When plaintiff returned to WJCAC on December 20, 2000, the doctor noted that plaintiff had been non-compliant with his medications and had become a problem at school but was doing much better since returning to his regimen with his mood, sleep, and school all going well.  (Tr. p. 277).  Following a telephonic check on plaintiff's status on January 2, 2001, it was

13

revealed that plaintiff had received no suspensions at school, was more cooperative and less defiant, and had not been picking his sores as he once did.   Ms. Barrett advised that plaintiff was making A's, B's and C's in school and that his conduct grades were straight A's.   Plaintiff had been generally cheerful in the previous few months, was able to get along with his peers and to concentrate, and had an improved appetite.   (Tr. pp. 275-276).

Approximately six weeks later, plaintiff was suspended from school for disrupting class and for vandalism after he failed to take his medication for three days.   Plaintiff's teachers were also seeing unidentified signs of depression.   Plaintiff advised Dr. Gandle that he had been feeling depressed due to students harassing him and had also been upset about one of his teachers.   He harbored suicidal thoughts recently but had not acted upon them.   (Tr. pp. 275-276).   A counseling session with plaintiff and one of his brothers went forward on the following day, at the conclusion of which plaintiff agreed not to hurt himself and his brother agreed to interact more with him.   (Tr. pp. 274-275).

On March 28, 2001, it was reported that plaintiff was still having some in-class outbursts and had recently received a behavior write-up for getting angry and not returning a book.   Plaintiff's teachers indicated that he was sometimes defiant and defensive at school and his mother attributed the behavior to stress surrounding

14

the impending arrival of another child in their family.  Plaintiff was doing "OK" at home with only occasional outbursts and he denied being depressed.   He was to continue with his medications and school officials were to be consulted to assess the situation. (Tr. pp. 273-274.)

Plaintiff was treated for mild contact dermatitis at the West Jefferson Medical Center on April 29, 2001.  (Tr. pp. 258-260).  He was treated again for that condition as well as allergies on May 1, 2001.  (Tr. pp. 261-262).  Plaintiff was next seen at WJCAC on May 9, 2001.   Dr. Gandle stated that things had been "fair" with plaintiff getting one recent behavior write-up from a substitute teacher and exhibiting some anger at home but otherwise doing "OK". Plaintiff's medications were continued.   (Tr. p. 273).   He was described as doing "OK" on January 28, 2001 although he was a little down because his brother had left town for the summer. Plaintiff was doing well with his prescribed medications with no side effects.  (Tr. p. 272)).   Plaintiff's condition was reviewed by WJCAC personnel on July 17, 2001, at which time various short and long term goals were established to address the problems resulting from his depression and anxiety.   (Tr. p. 339). Plaintiff was somewhat anxious on August 22, 2001 and had left school early that day with complaints of being dizzy.  An extra does of Buspar was to be implemented and plaintiff's anxiousness

15

was believed to be related to him transferring to a new school. (Tr. pp. 272, 300).

On September 5, 2001, plaintiff underwent a consultative psychiatric evaluation by Dr. Carmen Ramos. Plaintiff was eleven years old and was in fifth grade regular education classes at the time. In Dr. Ramos' medical history summary, she noted that plaintiff's "permit" to attend the school he had gone to from kindergarten to the fourth grade had been "revoked" because of his behavior which included vandalism, disobeying school rules, not doing his homework, and being disrespectful. Since being transferred to a new school, plaintiff had continued his pattern of not completing his school assignments. Ms. Barrett also described violent confrontations between plaintiff and his brother and plaintiff's inability to properly deal with his emotions.

When interviewed by the doctor, plaintiff volunteered that he saw pigs flying. On mental status examination, plaintiff was initially eager and bright but then complained of seeing underpant-stealing gnomes and flying pigs quite regularly, admitting, however, that he had not told his own doctor about these unusual occurrences. Plaintiff was oriented in all spheres but had decreased remote memory and decreased impulse control by history. He had felt like hurting himself. The diagnostic impression was ADHD, rule out psychosis not otherwise specified versus

16

malingering, and depression/anxiety by history with a GAF of 55. In her summary, Dr. Ramos remarked that plaintiff's condition had improved but then regressed when his doctor tried to discontinue some of his medications. Plaintiff continued to have difficulties with his attention and although he reported some psychotic symptoms to Dr. Ramos, she questioned whether plaintiff was simply malingering. In the cognitive domain, Dr. Ramos estimated that plaintiff was functioning in the low average range of intelligence and in the social domain, it was noted that plaintiff continued to have problems getting along with his brother. In the behavioral/emotional domain, Dr. Ramos observed that plaintiff continued to be overactive and that he had reported some unusual symptoms to her but not his regular doctor. Plaintiff was felt to be impulsive, very vulnerable to stress, and reportedly having difficulties with his attention and concentration. (Tr. pp. 278-281A).

On September 26, 2001, Dr. Gerald Wiener, an Administration medical consultant, reviewed the evidence then extant and found that plaintiff had a marked limitation in interacting and relating with others, a less than marked limitation in acquiring and using information and attending and completing tasks, and no limitations in the domains of moving about and manipulating objects, caring for himself, or health and physical well-being. Accordingly, the

17

consultant concluded that plaintiff's condition did not meet or functionally equal any of those set forth in the Listing of Impairments. (Tr. pp. 282-287).

Plaintiff was seen again at WJCAC on October 3, 2001 and reported being upset since his grandmother had passed away several days earlier. Otherwise, plaintiff was doing well at school with no side effects from his prescribed medications. He was to continue with his medications and return to the clinic in one month. (Tr. pp. 299-300, 331-332). Plaintiff was doing "fine" when Ms. Barrett called in for a refill for his Buspar on October 25, 2001. (Tr. p. 299). Plaintiff's in-school progress was described as "fair" on November 14, 2001 but Ms. Barrett felt like he was slower than the other students. Cognitive testing was discussed but otherwise there were no real problems present. The dosage of plaintiff's Prozac was increased to address his signs of depression. (Tr. p. 299).

On January 7, 2002, plaintiff returned to WJCAC and was described as very oppositional and refusing to listen. The increase to the dosage of his Prozac had not been implemented and he was characterized as isolated and depressed. Plaintiff was to continue on his prescribed medications. (Tr. p. 298). Plaintiff's progress was monitored by WJCAC officials on February 5, 2002 who set various goals that were to be met by July 30, 2002. (Tr. p.

18

337).  On February 6, 2002, plaintiff was doing well at home but his social worker at school had reported him for ignoring her and making animal noises.  Plaintiff was still moody at times but was better that day than he had been at the time of his most recent appointment.  (Tr. p. 298).  A school consultation was planned. (Id.).  Plaintiff was doing "fair" but was more aggressive of late when seen again at WJCAC on April 10, 2002.  There were no problems with his medication, his mood had been stable, and his sleep and appetite were good.  Plaintiff was to continue with his present medications and was to return to the clinic in two months.  (Tr. p. 297).

Plaintiff and his mother appeared for a transfer evaluation at WJCAC on July 30, 2002.  Plaintiff was a bit oppositional, remained mute most of the time, but had a high energy level.  His mood was depressed and angry and he was known to "clam up " or to throw things if agitated.  Plaintiff's affect was appropriate yet blunted, his thought processes were goal directed, and the psychiatrist questioned plaintiff's reports of hearing voices. Insight was limited and judgment was impulsive.  The diagnosis was rule out bipolar disorder, rule out depressive disorder, rule out ADHD by history, rule out social anxiety, oppositional disorder, and rule out impulse control disorder.  Trazodone was discontinued and plaintiff was left on Elavil, Prozac, and Buspar.  (Tr. pp.

19

334-336).   Various   goals   were   established   to   better   control
plaintiff's problems.  (Tr. p. 333).

Plaintiff was doing fairly well on Elavil when next seen at
WJCAC on August 6, 2002.  His speech was unpressured and he was not
as angry but he still fought with his brothers from time to time.
Plaintiff felt that Buspar was helping his mood and anger and was
making him feel less unstable.   Adderall was to be added to
plaintiff's medications.  (Tr. p. 328).   Trazodone was substituted
for Elavil after a telephone call from Ms. Barrett, confirmed by
plaintiff's teacher, revealed that plaintiff was having difficulty
waking in the morning, was sleeping in class, was generally
lethargic, and had severe headaches.   (Tr. p. 327).   Further
treatment options were discussed with plaintiff's mother on August
27, 2002 to better deal with the lethargy of not only plaintiff but
his brothers as well.  (Tr. pp. 326-327).

On November 1, 2002, plaintiff was evaluated by Dr. Mark Dean
of Divine Concepts, Inc.  Plaintiff's chief complaint was academic
deficiencies at school with him receiving C's and D's, being
suspended three times, and being generally disruptive.  Away from
school, plaintiff reportedly fought with his brothers and other
neighborhood children.    Plaintiff's medications at the time
included Trazodone, Prozac, Adderall, and Buspar and Ms. Barrett
herself took Paxil, Vistaril, and Trazodone.   On mental status

20

examination, plaintiff was alert, cooperative, had a good attention span, coherent and logical speech, and no bizarre behavior except his tendency to pick at his skin when depressed.  Plaintiff's mood and affect were depressed and his insight/judgment and rapport were poor but he was well-oriented, had good memory, and average intellectual functioning.   Dr. Dean's diagnosis was major depression.  (Tr. pp. 341-345).

On November 4, 2002, plaintiff's teacher at Adams Middle School requested that he be placed in a self-contained, small group special education class to address his "serious emotional concerns" and pending his evaluation and the completion of an IEP to assess his behavioral problems.  (Tr. pp. 301-306).  The IEP was completed over the next several days and identified poor impulse control as plaintiff's primary weakness.  He was reportedly failing math, science, and physical education.  As respects math, plaintiff's conceptual appreciation was 80%, well above-average, but he performed poorly on tests and did not complete his classwork.  In social studies, although plaintiff ranked in the top 92% on standardized testing, his grade for the first nine weeks was a "D," he was not felt to be working at full capacity, and his study habits needed improving.  Similarly, plaintiff had placed at 87% in science but was failing in regular class due to poor study habits and inconsistent effort in class.  As completed, plaintiff's

educational need areas were identified as "social" and "behavioral", typically manifested by a failure to follow directions and a history of non-compliant and disruptive behavior. (Tr. pp. 301-325).

When plaintiff returned to Dr. Dean December 13, 2002, it was reported that he was doing well on his prescribed medications with stable behavior in school and no problems with sleeping/eating, no severe depression or suicidal ideations, and no out-of-control anger or violent behavior. (Tr. p. 341). Plaintiff was doing well on February 7, 2003 with only one of his teachers complaining rather than all of them as used to be the case. (Tr. p. 340).

On March 19, 2003, the Jefferson Parish School System issued an initial IEP following plaintiff's interim placement in special education classes. While there had been fewer reports of aggressive behavior, plaintiff had a history of "shutting down" and refusing to complete his work. Since being placed in special education classes, plaintiff had received two disciplinary referrals and one suspension. Plaintiff's teachers reported that he was very withdrawn in class, that he seldom responded to questions, and that he picked his sores until they bled or became infected. Even when he was on medication his behavior was unacceptable and without it, he was described as "very unstable." Plaintiff's grades were indeed suffering and he had received F's in

Social Studies for the second and third quarters and was in danger of failing the class for the year. In history class, he refused to complete any work, instead putting his head on his desk and not even attempting to take any tests. When observed in class, plaintiff did not participate in the lesson, write down his homework assignment, or even take out any needed instructional materials. Although plaintiff was in the bright normal range of intellectual functioning upon standardized testing, his behavior was "significantly interfering" with his ability to learn. Based on the results of the evaluation, plaintiff was felt to be in need of continued special education services to combat his classification as emotionally disturbed. (Tr. pp. 376-386).

On April 10, 2003, plaintiff was seen by Dr. Helen Mason. He was still having difficulties at school, refusing to take tests and to dress out in physical education class and not doing his work. Plaintiff also continued to pick at his skin. Effexor was discontinued and plaintiff was started on Seroquel to better control his problems. The diagnosis was mood disturbance disorder. (Tr. p. 349). Atarax was to be substituted for Seroquel after plaintiff's mother reported on May 5, 2003 that it was making him extremely sleepy at school. (Tr. p. 348). Plaintiff's placement in special education classes was re-evaluated on May 8, 2003 and he was felt to have educational needs in the academic/cognitive,

behavioral, and social fields.  He was believed to be capable of doing better work but his lack of motivation and his inability to appropriately interact with other students were hampering his progress and jeopardizing his chances of passing on to the next grade level. (Tr. pp. 350-375).

The final piece of evidence appearing in the record documents plaintiff's return to Dr. Mason on July 7, 2003 after having missed his last appointment due to a tropical storm. Plaintiff had run out of Adderall and Trazodone and was increasingly defiant, aggressive, and impulsive. His medications were refilled. (Tr. p. 347).

As noted earlier, plaintiff challenges the Commissioner's decision to deny SSI benefits on one ground, namely, that the ALJ erred in failing to find that his impairments were functionally equal to that described in Section 112.11 of the Listing of Impairments. Typically, functional equivalence is addressed by the ALJ only after it is first determined that the claimant does not suffer from an impairment that meets or medically equals a condition set forth in the Listing of Impairments. See, e.g., Newby v. Commissioner of Social Security, 2006 WL 163138 at *4 (W.D. Va. 2006). A review of the ALJ's nine-page decision in this case reflects that he devoted roughly one-third of it to his functional equivalence analysis after summarily concluding that "... claimant's condition does not meet or medically equally the

24

criteria for any impairment listed in Appendix 1, Subpart P, Part 404." (Tr. pp. 21-24, 21). On that score, at the administrative hearing held on July 30, 2003, the following pertinent exchange occurred between the ALJ and the ME at the outset of the latter's testimony:

> REEXAMINATION    OF    MEDICAL    EXPERT    BY
> *ADMINISTRATIVE LAW JUDGE:*
>
> Q:    Doctor, does this young man meet, equal
>       or functionally equal any listing under
>       those state of impairments?
>
> A.    Yes.  I think he meets the, the listing
>       of impairments for ADHD, 112, I think its
>       112.11.
>
> (Tr. p. 408).

In his written opinion, although the ALJ gave "... great weight to the opinion of Dr. Kronberger, as he is an expert in the area of ADHD and he had a chance to observe claimant ...", nowhere does the ALJ mention the above-quoted testimony or offer any explanation for rejecting the ME's answer to the direct, straightforward question posed to him. (Tr. p. 24). Furthermore, the ALJ credited Dr. Kronberger with testifying that plaintiff "... had only a 'less than marked' limitation in attending and completing tasks" but the phrase "attending to and completing tasks" was not uttered by the ME at all. (Tr. p. 23). For these reasons, it will be recommended that plaintiff's case be remanded

to the Commissioner for clarification and further development of Dr. Kronberger's testimony.

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for clarification and further development of Dr. Kronberger's testimony.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this  24  day of  Feb  , 2006.


UNITED STATES MAGISTRATE JUDGE